# UNITED STATES DISTRICT COURT

for the

Central District of California

**(UNDER SEAL)**

In the Matter of the Search of

**ISABELLA MARIA DELUCA**

)
)
)
)
)
)

Case No. 8:24-MJ-00124

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| (See Attachment B) | (See Attachment B) |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Justin David Winecoff
_____
*Applicant's signature*

*Justin David Winecoff, Special Agent (FBI)*
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state:   Santa Ana, California

Hon. Autumn D. Spaeth, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Caitlin J. Campbell (714) 338-3541

**AFFIDAVIT**

I, JUSTIN DAVID WINECOFF, being duly sworn, declare and state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Washington, D.C. Field Office.  I have been in this position for more than seven years. During that time, I have investigated criminal cases relating to international terrorism, domestic terrorism, bomb threats, civil disturbances, and riots.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.   As a Special Agent, I have received both formal and informal training from the FBI regarding international and domestic terrorism investigations.  Currently, I am tasked with investigating criminal activity in and around the U.S. Capitol on January 6, 2021.  As a Special Agent, I am authorized by law or by a government agency to engage in or supervise the prevention, detection, investigation, or prosecution of a violation of federal criminal laws.

3.    Through my training and experience, I am familiar with how individuals unlawfully entered the U.S. Capitol and caused or attempted to cause the disruption of the Congressional proceedings that day to certify the Electoral College vote of the 2020 U.S. Presidential Election.  I am also familiar with how individuals planned, coordinated, and documented their criminal conduct at the U.S. Capitol on January 6, 2021, which includes the use of digital devices, social media, and other electronic communications.

## II.    PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of applications seeking warrants to search the following:

a.    The Property located at 4302 Molino Irvine, California, 92618 (the "PREMISES"), as described further in Attachment A-1;

b.    The Person of ISABELLA MARIA DELUCA ("DELUCA"), as described further in attachment A-2;

c.    Digital devices owned, used, or controlled by DELUCA, including but not limited to an Apple iPhone 14 Plus with the phone number XXX-XXX-5223 and IMEI number 355348890977460 (the "SUBJECT DEVICES"), any or all of which are believed to be on DELUCA's person, as described further in Attachment A-2, or located at the PREMISES, as described further in Attachment A-1.

5.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of

2

Title 18, United States Code, Sections 641, 2 (Theft of Government Property and Aiding and Abetting); 1752(a)(1) (Entering or Remaining in Restricted Buildings or Grounds); 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); and Title 40, United States Code, Sections 5104(e)(2)(D) (Disorderly or Disruptive Conduct in the Capitol Buildings) and 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building) (collectively, the "TARGET OFFENSES"), as described in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, a review of law enforcement databases, and information obtained from law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III.   <u>SUMMARY OF PROBABLE CAUSE</u>

7.   The U.S. Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related

criminal activity that occurred at the U.S. Capitol on January 6, 2021, as a joint session of the U.S. Congress convened to certify the results of the Electoral College vote in the 2020 U.S. Presidential Election.

8.    Based upon the evidence collected to date, on January 6, 2021, DELUCA (1) unlawfully entered the restricted area around the U.S. Capitol; (2) recorded video and/or took photographs within the restricted area using her cellular phone; (3) entered Senate Terrace Room 2 Mezzanine ("ST-2M") through a broken window on the Lower West Terrace of the U.S. Capitol; and (4) removed, and aided and abetted other rioters in removing, a coffee table from ST-2M, which she then passed to rioters outside through another broken window.    This table was subsequently used to assault law enforcements officers guarding the Lower West Terrace Tunnel (the "Tunnel"), as described further below.[1]

---

[1] The Tunnel consisted of a rounded arch constructed for the inauguration, which was fixed to a set of doors leading into the U.S. Capitol.  The arch and doors are narrow, no more than 10 feet across, and created the appearance of a tunnel on January 6, 2021.  After the police perimeter was breached on the West Plaza of the U.S. Capitol, many law enforcement officers retreated into the Tunnel to regroup. Rioters then streamed into the Tunnel in large numbers where they began to fight the police in an attempt to gain entry into the U.S. Capitol.  A group of officers, using their bodies to barricade the entrance, constituted the only barrier between the rioters in the Tunnel and entry into the U.S. Capitol.  Some of the most vicious assaults on law enforcement on January 6, 2021 occurred in the area by the Tunnel.

9.   On February 28, 2024, U.S. Magistrate Judge Robin M. Meriweather of the U.S. District Court for the District of Columbia signed a criminal complaint charging DELUCA with violating the TARGET OFFENSES for her conduct at the U.S. Capitol on January 6, 2021, and issued a warrant for DELUCA's arrest.  Judge Meriweather also signed Rule 41 search warrants for DELUCA's person and apartment in Washington, D.C.  Law enforcement subsequently determined, however, that DELUCA is currently staying with another individual at the PREMISES in Irvine, California.  Law enforcement intends to arrest DELUCA at the PREMISES and execute the requested search warrants at that time.

## IV. STATEMENT OF PROBABLE CAUSE

10.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following.

### A. The Riot at the U.S. Capitol on January 6, 2021

11.  The FBI, USCP, and assisting law enforcement agencies are investigating a riot and related offenses that occurred on January 6, 2021, at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510.

12.  The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only

5

authorized people with appropriate identification are allowed access inside the U.S. Capitol.

13. On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, two staircases, and multiple terraces. On the east side of the Capitol is the East Front, which includes three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and closed to members of the public on January 6, 2021.

14. On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time[2] in the House of Representatives. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

_____

[2] All times stated in this affidavit are in Eastern Standard Time or Eastern Daylight Time unless otherwise noted.

15.   The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 because the Vice President and the immediate family of the Vice President, among others, would be visiting and did visit the Capitol complex that day.

16.   At around 1:00 p.m., individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.  As a result of these and other similar actions by the crowd, the situation at the Capitol became a civil disorder as that term is used in Title 18, United States Code, Section 231.  The civil disorder obstructed the ability of the U.S. Secret Service to perform the federally protected function of protecting Vice President Pence.

17.   As they advanced unlawfully onto Capitol grounds and towards the U.S. Capitol building over the next several hours, individuals in the crowd destroyed barricades and metal fencing and assaulted law enforcement officers with fists, poles, thrown objects, and chemical irritant sprays, among other things. Individuals in the crowd carried weapons including tire irons, sledgehammers, bear spray, and tasers, some of which were also used to assault members of law enforcement.  A number of

individuals in the crowd wore tactical vests, helmets, and respirators.

18.  At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.

19.  Beginning shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement.

20.  Once inside, certain of the unlawful entrants destroyed property, stole property, and assaulted federal police officers.

21.  Between approximately 2:10 p.m., and 2:30 p.m., Vice President Pence evacuated the Senate Chamber, and the Senate and House of Representatives went into recess.  Unlawful entrants into the U.S. Capitol building attempted to break into the House chamber by breaking the windows on the chamber door.  Law enforcement officers inside the House of Representatives drew their weapons to protect members of the House of Representatives who were stuck inside.  Both the Senate and the House of Representatives Chamber were eventually evacuated.

22.  At around 2:47 p.m., subjects broke into the Senate Chamber not long after it had been evacuated.

23.  At around 2:48 p.m., District of Columbia Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.  Mayor Bowser's order imposing a curfew in the District of Columbia impacted interstate commerce.  For example, Safeway closed all 12 of its grocery stores in the District of Columbia as of 4 p.m. that day, and Safeway's stores were supposed to close at 11 p.m.

24.  At about 3:25 p.m., law enforcement officers cleared the Senate floor.  Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

25.  Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening, the joint session could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol throughout the events, including during the time he was evacuated from the Senate Chamber until the joint session concluded at approximately 3:44 a.m. on January 7, 2021.

26.  During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile

9

devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol without authority to be there.

27.  Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

28.  Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

**B. Investigation into DELUCA's Participation in the Riot at the U.S. Capitol on January 6, 2021**

29.  On January 9, 2021, the FBI received an online tip identifying DELUCA as a possible suspect who participated in the January 6, 2021 riot at the U.S. Capitol.  The tipster alleged that DELUCA deleted social media posts about being at the U.S. Capitol on January 6.

30.  After receiving the tip, the FBI telephonically interviewed DELUCA on January 21, 2021.  DELUCA admitted to the FBI that she was present at the U.S. Capitol on January 6, 2021, but she claimed that she never entered the U.S. Capitol building.  DELUCA further explained that she went to the U.S. Capitol with some friends, but they were eventually separated from each other.

31.  The FBI also telephonically interviewed DELUCA's mother on January 21, 2021.  According to DELUCA's mother, DELUCA went to the U.S. Capitol with some friends, but DELUCA did not go inside the U.S. Capitol building.  DELUCA's mother further stated that she viewed DELUCA's live feed Instagram video and saw DELUCA standing outside the U.S. Capitol.

32.  Based on the above, the FBI opened an investigation of DELUCA.  According to subpoenaed bank records, DELUCA made several purchases in the Washington D.C. area between January 5, 2021 and January 8, 2021.  On January 5, 2021, DELUCA incurred a $108.00 charge from Amtrak that noted "Orig: NYP, Dest: WAS."  These codes

11

indicate her trip originated at New York Penn Station in New York, New York, and her destination was Union Station in Washington, D.C.  Records subpoenaed from Amtrak confirmed that DELUCA traveled from New York City to Washington, D.C. on January 5.

33.  On January 6, 2021, DELUCA incurred a charge of $160.86 from the Kimpton Lorien Hotel, which is located at 1600 King Street, Alexandria, Virginia.  Records subpoenaed from the Kimpton Lorien Hotel confirmed that DELUCA checked in on January 6, 2021 and checked out on January 8, 2021.

34.  On January 6, 2021, DELUCA also incurred a charge from Dunkin Donuts Store No. 350957 located at 1101 14th Street NW in Washington, D.C., which is approximately 1.9 miles from the U.S. Capitol.  She also incurred a charge from CVS Pharmacy Store No. 1334 located at 717 14th Street NW in Washington, D.C., which is approximately 1.5 miles from the U.S. Capitol.

35.  During its investigation, the FBI obtained a search warrant for DELUCA's Instagram accounts on July 13, 2022. Subscriber records from Instagram indicate that the account with username "isabellamdeluca" is subscribed to by DELUCA.  On the evening of January 5, 2021, DELUCA's Amtrak train broke down near Baltimore, Maryland.  DELUCA messaged others on Instagram, "My train isn't working" and "I need a ride to dc."  She also posted the following Instagram story.  DELUCA's Instagram messages suggest that she eventually received a ride to Alexandria, where

the Kimpton Lorien Hotel is located, in the early morning hours of January 6, 2021.



*Image 1*

36.  At 2:55 p.m. on January 6, 2021, DELUCA replied to a Twitter post saying, "Fight back or let politicians steal and election? Fight back!"[3]

---

[3] The FBI also obtained a search warrant for DELUCA's Twitter (now X Corp.) account on July 13, 2022.  Subscriber records from Twitter indicate that the account with username @IsabellaMDeluca is subscribed to by DELUCA.  A further review of DELUCA's Twitter account revealed that there were no tweets (as opposed to replies



*Image 2*

37.   Shortly thereafter, at 3:20 p.m., an Instagram user messaged DELUCA, "I'm walking to the Capitol!"  A few minutes later, DELUCA responded, "Okay! I'm going to head there now." DELUCA later messaged the same person, "I'm here," at approximately 3:46 p.m.

38.   Video identified from USCP CCTV surveillance footage and open-source video footage place a woman matching DELUCA's appearance inside and around the U.S. Capitol on January 6, 2021. In all photographs and videos, DELUCA is wearing a brown jacket, black pants, white shoes, and at times is wearing a red, white, and blue neck gaiter partially covering her face.

39.   Around 4:24 p.m., CCTV surveillance footage captured DELUCA, circled in yellow, within the restricted area on the temporary inaugural platform constructed on the Lower West Terrace of the U.S. Capitol, as depicted in Image 3 below.  In this Image, DELUCA appeared to cover her face from tear gas blowing in the

_____

and direct messages) between January 3, 2021 and January 10, 2021.

wind.  She remained in this area for several minutes and appeared to be using her cell phone, as shown in Image 4 below.



*Image 3*



*Image 4*

40.  From there, DELUCA continued to descend the inaugural platform.  Around 4:30 p.m., DELUCA arrived in an area near the Tunnel and outside of ST-2M, which is directly to the left of the Tunnel (as one faces the Tunnel).  Image 5 below is a screenshot from an open-source video showing DELUCA using her cell phone to record video and/or take photographs outside of ST-2M.  ST-2M is one of a suite of conference rooms available for members of congress and their staffs.  Although ST-2M was unoccupied on January 6, 2021, it is considered a sensitive location that is not open to members of the public.

16



*Image 5*

41.  Images 6 and 7 below are also screenshots from open-source videos.  DELUCA continued to record video and/or take photographs outside of ST-2M, witnessing rioters inside the room steal pieces of furniture, including a lamp and a chair, and passing them to the rioters outside.

17



*Image 6*



*Image 7*

42.  DELUCA then entered ST-2M through one of the lower windows that had been broken by rioters, as shown in Image 8 below.



*Image 8*

43.  Approximately 90 seconds after entering ST-2M, DELUCA passed, and assisted other rioters in passing, a table out of one of the broken windows, as depicted in Image 9 below.



*Image 9*

44.   After DELUCA passed the table out of the window, DELUCA appeared to use her cell phone to record video and/or take photographs of the scene, as shown in Image 10 below.  At the same time, rioters passed the table in the direction of the Tunnel, where it was subsequently used as a weapon against law enforcement officers.



*Image 10*

45. About two-and-a-half minutes after entering, DELUCA exited ST-2M through the same broken window through which she passed the table, as depicted in Image 11 below. As DELUCA was climbing out of the window, the rioter dressed in all black with a neck tattoo used a baseball bat to smash the adjacent window. During her exit, DELUCA appeared to drop her cell phone and another rioter picked it up and passed it to her, as shown in Image 12 below.



*Image 11*



*Image 12*

46.  While inside ST-2M, DELUCA witnessed a chaotic scene with overturned and broken furniture thrown about the room haphazardly.  Image 13 below is a screenshot from a cell phone video taken inside ST-2M around the same time DELUCA was there. Later in the same video, DELUCA can be seen standing on the ledge outside the ST-2M windows.



*Image 13*

23

47.    Image 14 is a screenshot from an open-source video. DELUCA, with the neck gaiter partially covering her face, remained on the ledge outside ST-2M for approximately the next two minutes. At one point, DELUCA appeared to be observing the chaos at the mouth of the Tunnel, including the rioters passing a long wooden beam towards the mouth of the Tunnel, as shown in Image 15.



*Image 14*

24



*Image 15*

48.  Around 4:45 p.m., several minutes after DELUCA exited ST-2M, another rioter, Timothy Desjardins, circled in yellow in Image 16 below, picked up a wooden table leg in front of the Tunnel and used that leg to assault law enforcements officers. Simultaneously, another rioter picked up a table, circled in red, from the same location in front of the Tunnel.  That rioter proceeded to throw the table at the officers in the Tunnel, as shown in Images 17 through 19 below.  The table bears a strong resemblance to the table that DELUCA passed out of the window in Image 9 above, sharing the same design on the apron.  But the table legs were broken off at some point in the melee.

25

49. Your affiant has reviewed correspondence and business records from the U.S. Senate Sergeant at Arms, which valued the replacement cost of the coffee table taken from ST-2M at approximately $637.96.



*Image 16*



*Image 17*



*Image 18*



*Image 19*

50.   Later that same day, at 5:53 p.m., DELUCA messaged an acquaintance on Instagram, "It's insanity here" and "I got maced and had a sound bomb go off right next to me."

51.   Over the next several days, DELUCA continued to post on social media about the riot at the U.S. Capitol.  In the early morning hours of January 7, 2021, an Instagram user messaged DELUCA, "I'm wondering why you support the breaking into the capitol."  DELUCA responded, "According to the constitution it's our house."

52.   On January 8, 2021, DELUCA commented on a post on Instagram: "I got maced pretty bad about three times, and on top of that it was extremely windy, so it was blowing everywhere. While I do believe some people were placed there to cause chaos I

28

don't believe that people were faking being maced.  Even if they
were not directly hit, the wind was carrying it and affecting
everyone."  Several minutes later, DELUCA commented a second time
saying, "I used milk to get the mace/tear gas out of my eyes.  I've
heard for some people holding onions near their eyes and nose can
protect them from the tear gas.  I'm not 100% sure tbh."

53.  On January 14, 2021, DELUCA issued a lengthy statement
on social media about January 6.  Among other things, DELUCA
stated: "I was there on Jan. 6.  I have mixed feelings.  People
went to the Capitol building because that's Our House and that's
where we go to take our grievances.  People feel, as do I that an
election was stolen from them and it was allowed."

54.  On January 15, 2021, in an Instagram message, DELUCA
suggested that the former president should declare martial law and
overturn the election: "So it talks about how to save the election
with all the fraud that's happened.  I can see from the notes that
he suggests martial law.  If Trump declares martial law in 7
states, his campaign allies could take control of the state's
ballots & overturn the results of the election in Trump's favor.
Which would be ideal."

55.  DELUCA also acknowledged deleting Instagram posts from
her profile in the immediate aftermath of January 6.  On January
9, 2021, an acquaintance messaged DELUCA on Instagram, "Not sure
if this is right but your profile shows only 9 posts."  DELUCA

replied, "Yes I deleted a lot of my posts."  Further review of DELUCA's Instagram profile revealed there were no posts (as opposed to direct messages) between November 27, 2020 and January 11, 2021. Based on my knowledge, training, and experience, people who commit criminal acts will often delete information about those acts from social media accounts in an attempt to thwart any subsequent criminal investigation.

56.  More recently, on December 5, 2023, your affiant interviewed employees of the apartment building located at 1205 Half Street SE, Washington, D.C. 20003, where DELUCA is currently domiciled.  Your affiant showed one of the employees a photograph of DELUCA from her Instagram account, and the employee positively identified the person in the photograph as DELUCA.  Your affiant then provided the same employee, who regularly sees DELUCA at the apartment building, with six photographs of DELUCA at the U.S. Capitol on January 6, 2021.  The employee positively identified DELUCA in each of the six photographs.  Additionally, through my own investigation, including reviewing DELUCA's driver's license photo, DELUCA appears to be the same person in the screenshots above and other video footage collected on January 6, 2021.

57.  On February 28, 2024, U.S. Magistrate Judge Robin M. Meriweather of the U.S. District Court for the District of Columbia signed a criminal complaint charging DELUCA with violating the

TARGET OFFENSES for her conduct at the U.S. Capitol on January 6, 2021, and issued a warrant for DELUCA's arrest.

### C. Probable Cause Regarding the SUBJECT DEVICES

58. Based on the FBI's investigation, the amount of recording and photography that DELUCA appeared to do using a cell phone while at the U.S. Capitol indicates a high likelihood that this information is still stored on the cellular device and/or other electronic devices owned by DELUCA. As described above, DELUCA appeared to take photos or record videos multiple times while at the U.S. Capitol on January 6, 2021. Accordingly, there is probable cause to believe that this evidence was on her cell phone and is likely to still be contained in her cell phone.

59. Further, based on the investigation, numerous persons committing the TARGET OFFENSES, including DELUCA, possessed digital devices to communicate with other individuals to plan their attendance in Washington D.C. on January 6, 2021, to coordinate with other participants at the gatherings there that day, and to communicate and post on social media and digital forums about the events of January 6 after they occurred. As described above, the FBI's investigation confirmed that DELUCA used social media, including Instagram and Twitter, to communicate with others about travel to Washington, D.C., and the events at the U.S. Capitol on January 6, 2021.

60.  Based on my training and experience, this information can (i) reflect the preparation for, arrangement of, and commission of the TARGET OFFENSES; (ii) identify the subject's presence at locations relevant to the TARGET OFFENSES; (iii) reflect the ownership and use of the cellular telephones by persons involved in the commission of the TARGET OFFENSES; (iv) document meetings and communications between co-conspirators and others; and (v) demonstrate planning, preparation, motive, and intent regarding the TARGET OFFENSES.

61.  Moreover, it is well known that virtually all adults in the United States use mobile digital devices.  Based on data from February 8, 2021, the Pew Research Center for Internet & Technology estimated that 97 percent of Americans owned at least one cellular phone, and that same report estimated that 85 percent of Americans use at least one smartphone.  See Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/(last visited March 11, 2024).

62.  Based on my training and experience, I also know that some individuals who participated in the TARGET OFFENSES have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications.  By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

63.  Based on my training and experience, I know that cell phones are expensive, and people routinely retain their cell phones for many months or years.  I also know that when individuals acquire new cell phones, they commonly transfer data from their previous phone, including contact information, text messages, and photographs.

64.  In addition, based on my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices, such as the Apple iCloud service.  Thus, there is reason to believe that evidence of the offense that originally resided on DELUCA's cell phone may also be saved to other digital devices on her PERSON or within the PREMISES.

65.  Based on a search of open-source records, the FBI discovered that DELUCA's cell phone number was XXX-XXX-5834 (the "5834 Number") around the time of January 6, 2021.  During the investigation, the FBI obtained a search warrant from T-Mobile U.S., Inc. for the 5834 Number.  The account for the 5834 Number was active on January 6, 2021, and registered to DELUCA's mother. Based on call records, DELUCA appeared to have used the 5834 Number as her cell phone with International Mobile Equipment Identity ("IMEI") 352856110067440.  In the early morning hours of January

33

6, 2021, the 5834 Number made calls originating from Baltimore, Maryland, which is consistent with DELUCA's travel itinerary and social media communications described above. During the day on January 6, 2021, the 5834 Number made and received several calls originating from Alexandria, Virginia, where DELUCA's hotel was located, and from several locations in Washington, D.C. near the U.S. Capitol. Instagram messages from DELUCA in January 2021 also confirm that she used the 5834 Number. According to records subpoenaed from T-Mobile, the account associated with the 5834 Number was subsequently terminated on February 8, 2021.

66. Since February 2021, DELUCA's cell phone number has been XXX-XXX-5223 (the "5223 Number"). According to the search warrant returns from Twitter, as of June 2022, DELUCA's Twitter account was associated with an Apple iPhone under the 5223 Number. Moreover, according to the search warrant returns from Instagram, DELUCA's Instagram account was associated with an Apple iPhone under the 5223 Number. DELUCA also verified her Instagram account using the 5223 Number, meaning that the account holder responded to a text sent to the registered phone number. DELUCA's application to move into 1205 Half Street SE, Washington, D.C. 20003, Apt. 527, also listed the 5223 Number under DELUCA's contact information.

67. Records recently subpoenaed from T-Mobile U.S., Inc. confirm that the 5223 Number is registered to DELUCA's mother and

is still active.  Until October 2023, the 5223 Number was an Apple iPhone 13 Pro Max with IMEI 356796487499660.  Beginning in or around October 2023 through February 15, 2024, the 5223 Number was an Apple iPhone 14 Plus with IMEI 355348890977460.

68.  Based on evidence collected to date, numerous persons committing the TARGET OFFENSES at the U.S. Capitol on January 6, 2021, possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses.

69.  As described above, there is evidence that DELUCA possessed a mobile digital device while at the U.S. Capitol on January 6, 2021, using that device to record video and/or take photographs.  There is also evidence that DELUCA used social media on that device to communicate with others about travel to Washington, D.C., and the events at the U.S. Capitol on January 6, 2021.

70.  Based on my training and experience, individuals regularly keep their cell phones on their person or at their residence.  Accordingly, there is probable cause to believe that DELUCA will be carrying one or more digital devices, including cell phones, on her person when the warrant is executed.  There is also probable cause to believe that any devices not located on DELUCA's person at the time this warrant is executed would be located at the PREMISES.

71.   The property to be searched includes digital devices owned, used, or controlled by DELUCA, including but not limited to an Apple iPhone 14 Plus with IMEI 355348890977460.   Your affiant has probable cause to believe that the SUBJECT DEVICES are currently located at 4302 Molino Irvine, California, 92618, because DELUCA is currently staying with an individual at that address.

### D. Probable Cause Regarding the PREMISES

72.   The FBI obtained a search warrant for historical and prospective cell site location information on DELUCA's 5223 Number.   The returns from T-Mobile revealed that DELUCA, who currently maintains a residence in Washington, D.C., was in Irvine, California from on or about February 5, 2024 to February 6, 2024, when DELUCA returned to Washington, D.C.   The data indicates that DELUCA traveled to the Irvine, California area again on or around February 16, 2024.   The historical and prospective location information suggests that DELUCA has remained in the Irvine, California area since mid-February.

73.   The FBI subsequently learned from American Airlines that DELUCA flew from Los Angeles International Airport ("LAX") to Ronald Reagan Washington National Airport ("DCA") on February 6, 2024.   DELUCA then traveled from DCA to LAX on February 16, 2024. DELUCA has no known travel plans to return to Washington, D.C.

74.   The FBI also learned that an individual named JARED JOSEPH JENNINGS ("JENNINGS") booked travel through American Airlines with DELUCA, flying from John Wayne Airport ("SNA") to Phoenix Sky Harbor International Airport ("PHX") departing April 13, 2024 and returning April 13, 2024.

75.   Based on an open-source query, JENNINGS currently resides at the PREMISES, 4302 Molino Irvine, California 92618, and has resided there for the last several years.  JENNINGS used this address when booking the aforementioned travel through American Airlines.  Law enforcement officers conducted a spot check on March 10, 2024, and saw JENNINGS outside the door of the PREMISES.

76.   Cell site location information from March 6, 2024 suggested that DELUCA traveled to Target Store T2128 located at 900 Spectrum Center Drive, Irvine, California 92618, which is approximately 1.2 miles from the PREMISES.  The FBI reviewed surveillance footage from the store and discovered that a blond woman matching DELUCA's appearance and description shopped there on March 6, 2024 around 7:33 p.m. PST, as pictured below.

37



T2128 : PTZ - Front Lanes {AP 711} : 03/06/2024 7:33:21 PM

*Image 20*

77.  On March 12, 2024, law enforcement agents observed DELUCA departing the PREMISES in the morning.  DELUCA exited the building and drove to Urth Café located at 308 N Pacific Coast Hwy, Laguna Beach, CA 92651, where the agents took the below photograph of DELUCA around 9:48 a.m. PST.



*Image 21*

78.   On March 12, 2024, the agents also observed DELUCA going to the same Target store described above around 12:00 p.m. PST. The agents then observed DELUCA return to the PREMISES at approximately 12:42 p.m. PST.   Based on the surveillance, travel records, and the historical and prospective cell site location information, there is probable cause to believe that DELUCA is staying at the PREMISES.

79.   Finally, your affiant understands that hundreds of people have been arrested in connection to the riot that occurred at the U.S. Capitol on January 6, 2021.   During searches of many

39

those people's homes, from early 2021 through the present, in multiple jurisdictions, law enforcement agencies have recovered clothing, paraphernalia, tools, and digital devices that were worn, used, or carried on January 6, 2021.

80. For example, as recently as February 8, 2024, the FBI searched a defendant's residence pursuant to a warrant and recovered distinctive clothing that the defendant wore at the Capitol on January 6, 2021, as well as devices with images taken on that day. On July 28, 2023, a search of a defendant's phone in the Southern District of Ohio yielded pictures and text messages pertaining to January 6, 2021. On October 9, 2023, a search warrant executed in the Western District of Wisconsin recovered clothing and gear worn by a defendant on January 6, 2021, including a ballistic vest and helmet, as well as a handwritten note about defecating in Nancy Pelosi's office, and a phone, camera, and computer hard drive. In the Eastern District of Missouri, officers executed a search warrant on October 30, 2023, recovering cell phones and a laptop containing text messages and other written material that established the defendant's conduct at the U.S. Capitol on January 6, 2021, which included assaulting police officers. On December 13, 2023, a search in the Northern District of West Virginia yielded two phones linked to January 6, 2021. In the Eastern District of California, a search warrant executed on December 15, 2023 recovered a cell phone with pictures taken by

the defendant was at the U.S. Capitol on January 6, 2021. On December 20, 2023, in the Western District of Washington, law enforcement officers seized a defendant's cell phone containing text messages and images from January 6, 2021. Searches continue to provide evidence of the offense conduct on that day.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES, AND METHODS TO BE USED TO SEARCH DIGITAL DEVICES[4]

75. Based on my knowledge, training, and experience, as well as information from those involved in the forensic examination of digital devices, I know that:

a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers,

_____

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim

that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats,

like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

　　　　e.　Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes

novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.   Based on the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time

and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

g. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

h. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

i. Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, transport the SUBJECT DEVICE(S) to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize

the information, records, or evidence described in Attachment B.

ii.  The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

iii. In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to determine whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols

47

used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

76. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for

48

only a short time.  I do not know the passcodes of the devices likely to be found in the search.

       c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress DELUCA's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of DELUCA's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    77. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.  CONCLUSION

    78. Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES, will be found at the PREMISES, on DELUCA's PERSON, and on the SUBJECT DEVICES, as described in Attachments A-1, A-2, and A-3.

_____
Justin D. Winecoff
Special Agent
Federal Bureau of
Investigation


Subscribed to and sworn before me
this _____ day of March 2024.


_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

50

## ATTACHMENT A-2

### PERSON TO BE SEARCHED

The person to be searched is ISABELLA MARIA DELUCA ("DELUCA"), date of birth February 1, 2000, with Social Security Number 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.  According to New York State records, DELUCA is 5'01" tall, weighs 125 pounds, and has blond hair and blue eyes.

The search of DELUCA shall include any and all clothing, personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within DELUCA's immediate vicinity and control at the location where the search warrant is executed.

    

4

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.    Except as described in Section II below, the items to be seized are the evidence, fruits, and instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 641, 2 (theft of government property and aiding and abetting), 18 U.S.C. § 1752(a)(1) (entering or remaining in restricted buildings or grounds), 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds), 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct in the Capitol Buildings) and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building) (the "TARGET OFFENSES") that have been committed by DELUCA and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

     a. Evidence of the TARGET OFFENSES, including but not limited to emails, text messages, direct messages, social media posts, communications, photographs, videos, and other writings from November 3, 2020 to March 31, 2021;

     b. Evidence of any conspiracy, planning, or preparation to commit the TARGET OFFENSES;

     c. Evidence concerning efforts after the fact to conceal or delete evidence of the TARGET OFFENSES, or to flee prosecution for the TARGET OFFENSES;

     d. Evidence concerning materials, devices, or tools that were used to unlawfully commit the TARGET OFFENSES;

6

e. Evidence of communication devices used in relation to the TARGET OFFENSES;

f. Evidence concerning the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

g. Evidence concerning efforts to obstruct, impede, or disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

h. Evidence concerning the breach and unlawful entry of the United States Capitol on January 6, 2021;

i. Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

j. Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

k. Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

l. Evidence concerning awareness that the U.S. Capitol was closed to the public on January 6, 2021;

m. Evidence of DELUCA's presence at the U.S. Capitol on or around January 6, 2021;

n. Evidence concerning the results of, challenges to, or questions about the legitimacy of the 2020 Presidential Election;

o. Evidence reflecting communications between DELUCA and other individuals discussing the commission of one or more of the TARGET OFFENSES;

p. Photographs or video that would constitute evidence of a violation of the TARGET OFFENSES;

q. Digital device(s) which contain records or evidence of the commission of the TARGET OFFENSES;

7

r. Evidence of who used, owned, or controlled the digital device(s) including at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

s. Evidence of software, or the lack thereof, that would allow others to control the digital device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

t. Evidence of the attachment to the digital device(s) of other storage devices or similar containers for electronic evidence;

u. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device(s);

v. Evidence of the times the digital device(s) were used;

w. Passwords, encryption keys, and other access devices that may be necessary to access the digital device(s);

x. Documentation and manuals that may be necessary to access the digital device(s) or to conduct a forensic examination of the digital device(s);

y. Records of or information about Internet Protocol addresses used by the digital device(s); and

z. Records of or information about the digital device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered in any Internet search engine, and records of user-typed web addresses.

II.   <u>**SEARCH PROCEDURE FOR DIGITAL DEVICES**</u>

2.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site and/or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

 i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for

9

and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "Encase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

10

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this

11

warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4.    During the execution of this search warrant, law enforcement personnel are authorized to: (1) depress the thumb and/or fingerprints of DELUCA onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and(2) hold the device in front of the face of DELUCA with her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of a any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.